**SIGNATURE COMBS, INC., f/k/a AMR Combs, Inc., et al., Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants.**

Civil Case Nos. 98–2777 D, 93–2968 D, 00–2245 D.

United States District Court, W.D. Tennessee, Western Division.

Aug. 20, 2004.

mation, and would not be protected by the      settlement privilege.

William H. Hyatt, Jr., Kirkpatrick & Lockhart, LLP, Newark, NJ, pro se.

David Wade, Shea Sisk Wellford, Martin, Tate, Morrow & Marston, Memphis, TN, Gary P. Gengel, Morgan, Lewis & Bockius, Princeton, NJ, William E. Norcross, Norcross Law Firm, Cordova, TN, Nicholas E. Bragorgos, McNabb, Bragorgos & Burgess, PLLC, Charlotte Knight Griffin, Memphis Light Gas & Water, for Plaintiffs.

Michael F. Rafferty, Harris, Shelton, Dunlap, Cobb & Ryder, Kenneth D. Henderson, Ford & Harrison, Steven Dale Townsdin, Thomas L. Henderson, Lewis Fisher, Henderson & Claxton, LLP, Allen T. Malone, Jef Feibelman, Burch, Porter & Johnson, Memphis, TN, George W. House, Robert J. King, III, Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, NC, L. Daniel Johnson, Johnson, Cocke & Brandon, Memphis, TN, Brian D. Williams, Mark E. Johnson, Stinson, Morrison, Hecker LLP, Kansas City, MO, Nicholas E. Bragorgos, McNabb, Bragorgos & Burgess, PLLC, Memphis, TN, David C. Peeples, West Memphis City Attorney, West Memphis, AR, Clyde W. Keenan, Keenan, Dabbous & Weiss, Memphis, TN, for Defendants.

Hawkins Machinery, Inc., Germantown, TN, pro se.

Rickey R. Danish, Memphis, TN, pro se.

## ORDER GRANTING IN PART AND DENYING IN PART DOBBS FORD, INC.'S MOTION FOR SUMMARY JUDGMENT AND ORDER DENYING SIGNATURE COMBS PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

DONALD, District Judge.

Before the Court is Dobbs Ford, Inc.'s ("DFI") motion for summary judgment. DFI argues that there is no evidence to support 1) the Signature Combs Plaintiffs' ("Plaintiffs") argument that DFI is liable or potentially liable as an "arranger" under § 107(a) of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), which is an essential element of Plaintiffs' claim for contribution under § 113 of CERCLA, or 2) Plaintiffs' assertion that DFI is the legal successor to Oakley Motor Company ("OMC") and thus is responsible for OMC's alleged CERCLA liabilities incurred from 1960 through 1972. Plaintiffs respond that there is at least a genuine

issue of material fact on both DFI's liability or potential liability under § 107(a) and as a successor to OMC, thereby precluding summary judgment in favor of DFI. Further, Plaintiffs argue that the evidence establishes DFI's liability as an "arranger" under § 107(a), and thus for contribution under § 113, and they request partial summary judgment in their favor on that issue. Finding no genuine issue of material fact on DFI's alleged corporate successor liability for OMC's 1960 through 1972 CERCLA liabilities, the Court grants in part DFI's motion for summary judgment on that issue. The Court does find that genuine fact issues remain on the claim that DFI is liable for contribution to Plaintiffs under § 113 and therefore denies both DFI's and Plaintiffs' motions for summary judgment on that issue.

## I. Factual and Procedural Background

The Court previously set out the general facts of this case. (*See* Order Granting Defs.' Mots. for Partial Summ. J., Docket # 431.)

Plaintiffs first named DFI as a defendant in their Fourth Amended Complaint, filed January 17, 2003. The Court granted DFI leave to file its summary judgment motion after the deadline set in the Case Management Order. (*See* Order Vacating Prior Order Extending Deadline for DFI to File Dispositive Mot. & Order Granting in Part DFI's Mot. to Modify Case Management Order, Docket # 574.)

The South Eighth Street Site no longer received waste oil sludges from Gurley Oil Company's ("Gurley") re-refinery in West Memphis, Arkansas, after some date in 1970. (Material Facts & Portions of the R. Relied Upon in Supp. of Def. DFI's Mot. for Summ. J. ¶ 2.) Waste oil sludges from the Gurley re-refinery were deposited at the Gurley Pit Site from some date in 1970 through 1975. (*Id.* ¶ 3.)

OMC operated a Ford dealership at 1048 Union Avenue in Memphis, Tennessee, from 1960 to 1972. (*Id.* ¶ 6.) Prior to 1966, Hull–Dobbs Company ("HDC") operated a Ford dealership on South Third Street in Memphis. (*Id.* ¶ 7.) HDC moved its Ford dealership to 2700 Poplar Avenue in Memphis in 1966. (*Id.*) DFI's Ford dealership at 2515 Mt. Moriah Road in Memphis opened on October 9, 1972. (*Id.* ¶ 1.)

Joseph Spann began to work for HDC in 1956, at its South Third Street location. (Spann Dep. at 8.) After a stint with one of the company's dealerships in New Orleans, Mr. Spann returned to the South Third Street location as a service manager in 1964. (*Id.* at 10.) Mr. Spann went with HDC to its 2700 Poplar location in 1966, also as service manager. (*Id.* at 11–12.) In 1972, Mr. Spann went to work at the 2515 Mt. Moriah location, which became DFI. He worked there as service manager until his retirement in 1992. (*Id.* at 12–14.) Mr. Spann never worked for OMC on Union, nor for Oakley–Keesee Ford ("OKF"). (*Id.* at 14–15.) When HDC moved out of the 2700 Poplar location in 1972, OKF moved into it. (*Id.* at 15.)

DFI submitted deposition testimony of Thomas M. Keesee, Jr., who was President of OKF. Mr. Keesee stated that, in 1972, certain parts of Hull–Dobbs Ford were moved from 2700 Poplar to Mt. Moriah, and certain other parts remained at 2700 Poplar under the name of OKF. Specifically, the new and used inventory and parts of Hull–Dobbs at 2700 Poplar moved to 2515 Mt. Moriah. At the same time, the inventory of new and used cars and parts from OMC on Union moved to the 2700 Poplar dealership. Mr. Keesee stated that the Mt. Moriah location then opened as HDC, while the 2700 Poplar location then opened as OKF. (Keesee Dep. at 63.)

OMC and Hull–Dobbs Ford were owned by common stockholders. (*Id.* at 60.)

The record contains a franchise agreement titled Ford Sales and Service Agreement, dated June 1, 1972, and only partially executed, between OMC at 1064 Union Avenue in Memphis and Ford Marketing Corporation. The record contains no other such agreements dated June 1, 1972. The record also contains a May 23, 1974, Amendment to Ford Sales and Service Agreement of June 1, 1972, also only partially executed, between Hull–Dobbs Ford, Inc., at 2515 Mt. Moriah Road in Memphis and Ford Marketing Corporation.

In his deposition, Mr. Spann testified as to the disposal of used oil from servicing of cars at the various locations at which he worked. At the Mt. Moriah location, the dealership had an underground storage tank. (Spann Dep. at 33.) Technicians at Mt. Moriah performed oil changes, filter changes, brake repairs, and other services. (*Id.* at 33–34, 56, 61.) The waste oil from those services was collected and then poured down a drain into the underground tank. (*Id.* at 71–73.) The underground tank was located in the rear of the building, such that, from where Mr. Spann worked, he would not necessarily have seen trucks picking up oil from the tank. (*Id.* at 28–30, 33.) Mr. Spann testified that he saw a Gurley truck at the Mr. Moriah location, though he did not know how many times he saw such a truck, nor did he specify years in which he saw a Gurley truck there. (*Id.* at 33, 35.) He did not see any other trucks pumping out used oil at the Mt. Moriah location. (*Id.* at 34.) Neither Mr. Spann nor anyone working under his supervision made the plans to have Gurley pick up the used oil from the Mt. Moriah location. (*Id.* at 35.) Mr. Spann expected that the management service would have ordered the pickups. (*Id.* at 36.) Mr. Spann did not speak with any of the Gurley drivers at the Mt. Moriah location. (*Id.* at 37.)

At some point, new laws were put in place that affected disposal of used oil. Mr. Spann testified that, while he was working at the Mt. Moriah dealership when those new laws went into effect, he could only "guess" that occurred three or four years after he started at Mt. Moriah. (*Id.* at 37–38.) At that time, management, including the business manager and general manager, gave him new instructions as to how to dispose of waste oil. (*Id.* at 38–39.) Also at that time, Safety Kleen started taking used oil from the Mt. Moriah dealership for recycling. (*Id.* at 40.)

The parties also submitted the deposition testimony of John Forrest Green, a truck driver employed by Gurley to pick up waste oil in Memphis in the 1960s, 1970s, and 1980s. Mr. Green testified that he picked up waste motor oil at "Hull–Dobbs Ford" from a underground tank once a week or once a month in the 1960s, 1970s, and 1980s. (Green Dep. at 60–62, 259–60.) Mr. Green testified that the Hull–Dobbs Ford dealership was located on Union Avenue. (*Id.* at 259.) Mr. Green did not testify as to pickups of waste oil at a Mt. Moriah Ford dealership.

Plaintiffs also submitted the declaration of William M. Gurley, who was "directly involved" in the day to day operations of Gurley from 1960 through 1975 and beyond. (Gurley Decl. ¶ 1.) Mr. Gurley declared that most businesses that used Gurley for oil pickups would call Gurley and request that their oil be picked up. (*Id.* ¶ 3.) Between 1969 and 1975, Gurley had no competition for pickup of waste oils in the Memphis metropolitan area, nor within a 150 mile radius of Memphis, except for one thirty-day period. (*Id.* ¶ 6.) Mr. Gurley recalled that Gurley collected waste oil from a number of Hull Dobbs dealerships, which he identified as one on Union Ave-

nue, one on Poplar Avenue, and one on Mt. Moriah, the last of which did not open until 1972. (*Id.* ¶ 37.) Mr. Gurley specifies that these three dealerships were Hull Dobbs on Union, OKF on Poplar, and DFI on Mt. Moriah.[1] (*Id.* ¶ 41.) Gurley picked up oil from those dealerships at least once a week, if not more often, between 1969 and 1975. (*Id.* ¶ 38.)

Testimony from Plaintiffs' expert Bruce Monthieth, in reliance on Environmental Protection Agency ("EPA") documentation, shows that used motor oil from automobiles and trucks contains CERCLA hazardous substances, including lead, barium, zinc, and PCBs. (App. of Exs. to the Signature Combs Pls.' Resp. in Opp'n to Def. DFI's Mot. for Summ. J., Ex. D, E.) Hazardous substances similar to those found in used motor oil, including PCB (sludge and oil), barium, lead, and zinc, were found at the Gurley Pit Site. (*Id.,* Ex. F.)

Plaintiffs' claims against DFI have two bases: first, that DFI is liable as an "arranger" for its activities from 1972, when the Mt. Moriah location opened, through 1975, when the Gurley Pit Site closed, and second, that DFI is liable as a corporate successor for OMC's CERCLA liabilities incurred from 1960 through 1972, when OMC operated its dealership on Union Avenue. In its motion for summary judgment, DFI argues that Plaintiffs have submitted no evidence supporting either argument. Plaintiffs, to the contrary, argue that at least a genuine issue of material fact exists as to both bases for liability and, moreover, that the evidence shows that DFI, through Mr. Spann, admitted its liability as an arranger.

## II. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In other words, summary judgment is appropriately granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party moving for summary judgment may satisfy its initial burden of proving the absence of a genuine issue of material fact by showing that there is a lack of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. 2548. This in turn may be accomplished by submitting affirmative evidence negating an essential element of the nonmoving party's claim, or by attacking the opponent's evidence to show why it does not support a judgment for the nonmoving party. 10a Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2727, at 35 (2d ed. Supp.1996).

Facts must be presented to the court for evaluation. *Kalamazoo River Study Group v. Rockwell Int'l,* 171 F.3d 1065, 1068 (6th Cir.1999). The court may consider any material that would be admissible at trial. 10a Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2721, at 40 (2d ed.1983). Although hearsay evidence may not be considered on a motion for summary judgment, *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 927 (6th Cir.1999), evidentiary materials presented to avoid summary

---

1. In his deposition, Mr. Gurley also stated that Gurley picked up oil from a Hull Dobbs agency or facility, during the time that Gurley had its refining operations in West Memphis, but he did not identify which dealership he meant in that statement. (Gurley Dep. at 60.)

judgment otherwise need not be in a form that would be admissible at trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Thaddeus–X v. Blatter,* 175 F.3d 378, 400 (6th Cir.1999).

In evaluating a motion for summary judgment, all the evidence and facts must be viewed in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Walborn v. Erie County Care Facility,* 150 F.3d 584, 588 (6th Cir.1998). Justifiable inferences based on facts are also to be drawn in favor of the non-movant. *Kalamazoo River,* 171 F.3d at 1068.

Once a properly supported motion for summary judgment has been made, the "adverse party may not rest upon the mere allegations or denials of [its] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A genuine issue for trial exists if the evidence would permit a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348.

### III. CERCLA § 113 Liability

#### A. Legal Standard

The purposes of CERCLA are to facilitate prompt and effective cleanup of hazardous waste sites financed by those responsible for the hazardous wastes. *See United States v. Consolidation Coal Co.,* 345 F.3d 409, 413 (6th Cir.2003); *Anspec Co., Inc. v. Johnson Controls, Inc.,* 922 F.2d 1240, 1247 (6th Cir.1991). "The remedial nature of CERCLA's scheme requires the courts to interpret its provisions broadly to avoid frustrating the legislative purposes." *Anspec,* 922 F.2d at 1247. A party is liable in a contribution claim under CERCLA's § 113(f)(1) if it is liable or potentially liable under § 107(a). 42 U.S.C. § 9613(f)(1) (2004) ("Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title."); *Consolidation Coal,* 345 F.3d at 413.

■ Section 107 liability exists when four elements are shown: 1) that the site involved is a "facility" within the meaning of CERCLA,[2] 2) that a release or threatened release of hazardous substance occurred there,[3] 3) that the release caused the party to incur response costs, and 4) that the defendant falls into one of the categories of potentially responsible parties ("PRPs") identified in § 107(a). *See Consolidation Coal,* 345 F.3d at 413; *Kalamazoo River Study Group v. Menasha Corp.,* 228 F.3d 648, 653 (6th Cir.2000). Liability is strict once the plaintiff establishes those four elements. *See Kalamazoo,* 228 F.3d at 656 (holding that it was error for district court to require plaintiff to show causation in § 113 action, because

**2.** CERCLA defines a "facility" in part as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9) (2004).

**3.** CERCLA defines a "release" in part as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C. § 9601(22) (2004).

CERCLA liability is strict); *United States v. Cello–Foil Prods., Inc.,* 100 F.3d 1227, 1231–32 (6th Cir.1996).

The four categories of PRPs in § 107(a) are:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal or any hazardous substance owned or operated any facilities at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance ..."

42 U.S.C. § 9607(a) (2004).

## B. Analysis

### 1. DFI's Motion

The first three elements of the prima facie case for liability under § 107(a) are not disputed here: the Gurley Pit Site is a "facility," a "release or threatened release" of hazardous substances occurred there, and Plaintiffs incurred response costs. The disputed issue is if a genuine issue of material fact exists as to whether DFI is an "arranger" within the meaning of § 107(a)(3), as to the used oil from its Mt. Moriah location from 1972, when the dealership opened there, through 1975, when the Gurley Pit Site closed. Each party insists that no fact issue is present, but

DFI argues that no evidence supports its liability as an arranger, while Plaintiffs argue that the evidence shows conclusively that DFI is liable as an arranger.

The record contains no contract or agreement showing an arrangement for the pickup of used oil at DFI's Mt. Moriah location. Therefore, the relevant statutory language is "otherwise arranged for." CERCLA does not provide a definition for the phrase "arrange for." *Cello–Foil,* 100 F.3d at 1231. The Sixth Circuit holds that the requisite inquiry is "whether the party intended to enter into a transaction that included an 'arrangement for' the disposal of hazardous substances." *Id.; see also AM Int'l, Inc. v. Int'l Forging Equip. Corp.,* 982 F.2d 989, 999 (6th Cir.1993) ("Liability only attaches to parties that have 'taken an affirmative act to dispose of a hazardous substance ... as opposed to convey a useful substance for a useful purpose.'") (quoting *Prudential Ins. Co. v. United States Gypsum,* 711 F.Supp. 1244, 1253 (D.N.J.1989)). This is a fact-specific inquiry. *See Fla. Power & Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313, 1317 (11th Cir.1990). The necessary intent is only the intent to be an "arranger"; the party cannot escape liability by claiming that it had no intent to have the waste disposed in a particular manner or at a particular site. *Cello–Foil,* 100 F.3d at 1232; *see also United States v. Aceto Agric. Chems. Corp.,* 872 F.2d 1373, 1381 (8th Cir.1989) ("Courts have also held defendants 'arranged for' disposal of wastes at a particular site even when defendants did not know the substances would be deposited at that site or in fact believed they would be deposited elsewhere."). Intent may be proven by direct evidence or inferred from the totality of the circumstances. *Cello–Foil,* 100 F.3d at 1231.

The facts in the record establish the following. Car servicing at the Mt. Mori-

ah dealership produced waste oils that were deposited into an underground storage tank. Those waste oils would have to be removed from the underground tank as it became full, thus some intent for accomplishing the pickup of used oil may be inferred. The waste oil contained hazardous substances that were the same as those found at the Gurley Pit Site. Mr. Spann, a management employee of DFI at Mt. Moriah, saw the Gurley truck picking up used oil at the Mt. Moriah location. Mr. Spann did not specify any dates for these pickups, but they occurred before Safety Kleen was brought in for recycling of the used oil, which occurred approximately three or four years after the Mt. Moriah location opened. Neither Mr. Spann nor the employees that he supervised set up the process by which Gurley picked up the waste oil at Mt. Moriah. Mr. Spann testified that he expected that management would have hired Gurley for those pickups, although no testimony from any of the management employees identified by Mr. Spann is present in the record. Further, Mr. Gurley declared that Gurley picked up used oil from a Ford dealership on Mt. Moriah. Mr. Spann never saw another company picking up waste oil from the Mt. Moriah location, and Mr. Gurley stated that Gurley had no competition for pickups in the Memphis area during the relevant time, except for one thirty-day period. Mr. Green, the Gurley truck driver in the Memphis area, however, did not state that he picked up waste oil from a Ford dealership on Mt. Moriah.

■ The record thus shows a genuine issue of material fact as to whether DFI had the requisite intent to enter into a transaction with Gurley that included an arrangement for the disposal[4] or treatment[5] of hazardous substances. Waste oils were produced, collected in the underground tank, and therefore had to be removed to empty the tank. Testimony of both DFI and Gurley employees places the Gurley truck at the Mt. Moriah location for pick up of those waste oils. Testimony further shows that entities called Gurley to request pickups, thus indicating that someone at DFI requested waste oil pickups from Gurley, which would demonstrate an intent to "arrange" under § 107(a). Should these facts be proven for the 1972 to 1975 time period, arranger liability would be established.

DFI argues that it cannot be liable under § 107(a)(3) because Gurley is liable under either or both of §§ 107(a)(2) or (4), because Gurley owned or possessed the wastes produced in its re-refining operation, and because Gurley, rather than DFI, made the actual arrangements for disposal of the waste at the Gurley Pit Site. These arguments are unavailing. First, liability

---

4. CERCLA defines "disposal" as having the same meaning as in the Solid Waste Disposal Act, 42 U.S.C. § 6903(3), that is, "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." See 42 U.S.C. § 9601(29); *Ekotek Site PRP Comm. v. Self,* 881 F.Supp. 1516, 1525 (D.Utah 1995).

5. CERCLA defines "treatment" as having the same meaning as in the Solid Waste Disposal Act, 42 U.S.C. § 6903(34), that is, "any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for storage, or reduced in volume. Such term includes any activity or processing designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous." See 42 U.S.C. § 9601(29); *Ekotek,* 881 F.Supp. at 1528.

of one entity as a PRP does not preclude the liability of other entities as PRPs; CERCLA liability may inure to any party that qualifies as a PRP under § 107(a). *See, e.g., United States v. Bliss*, 667 F.Supp. 1298 (E.D.Mo.1987) (placing CERCLA liability on multiple PRPs, in several § 107(a) categories, including generator, arranger, and facility owner). Second, actual ownership or possession of the hazardous substance is not required, as liability under § 107(a)(3) may be predicated solely on having arranged for treatment or disposal of the hazardous substance. *Id.* at 1306–07; *see also United States v. Wade*, 577 F.Supp. 1326, 1333 n. 3 (E.D.Pa.1983) (rejecting argument that transfer of ownership of waste at time of pickup for disposal absolves generator of liability). Third, that DFI did not itself make the actual arrangements for disposal at the Gurley Pit Site, or even that it was not aware of such arrangements, is irrelevant. *See Cello–Foil*, 100 F.3d at 1232; *Fla. Power & Light Co.*, 893 F.2d at 1319 ("[W]e conclude, as other courts have, that even though a manufacturer does not make the critical decisions as to how, when, and by whom a hazardous substance is to be disposed, the manufacturer may be liable."); *Aceto*, 872 F.2d at 1381. Fourth, that Gurley re-refined the waste oil, which resulted in the production of waste containing hazardous substances, does not negate the fact that the used car oil collected at the Mt. Moriah location and used in Gurley's re-refining already contained hazardous substances, even before Gurley re-refined it. CERCLA is a strict liability statute; once the elements for liability under § 107(a) are shown, the entity cannot escape liability with such arguments as DFI attempts here.

DFI also argues that it is only a matter of speculation as to whether Mr. Spann saw the Gurley truck at its Mt. Moriah location in the 1972 to 1975 period, or at some point after 1975 but before his 1992 retirement, and thus that Mr. Spann's testimony does not support Plaintiffs' argument. On summary judgment, the Court takes the facts in the light most favorable to the non-moving party. Here, Mr. Spann testified that he saw the Gurley truck before Safety Kleen began picking up the waste oil and that Safety Kleen began pickups when the new laws on disposal went into effect, which he guessed was approximately three or four years after 1972. Taking these facts in the light most favorable to Plaintiffs, there is a genuine issue of fact as to whether Mr. Spann saw the Gurley truck at the Mt. Moriah dealership between 1972 and 1975.

Accordingly, the Court denies DFI's summary judgment motion as to its CERCLA § 113 liability.

### 2. Plaintiffs' Motion

Plaintiffs argue that the evidence presented on summary judgment is sufficient to establish DFI's liability as an arranger and that, through its former employee, Mr. Spann, DFI admitted its CERCLA liability for the 1972 through 1975 period.

■ The Court finds that the evidence is insufficient to direct summary judgment for Plaintiffs because certain fact issues remain. First, while Mr. Spann did testify to seeing the Gurley truck picking up waste oil at the Mt. Moriah location before Safety Kleen began pickups, he was not sure of the dates that Safety Kleen began pickups. Rather, he guessed that the new laws went into effect "[m]aybe four years, three years, something like that" after the Mt. Moriah dealership opened (Spann Dep. at 38), and Safety Kleen began its operations after that. Taking the facts in the light most favorable to DFI, such a date is not concrete enough to establish pickups within the relevant time period. Since Mr. Spann merely guessed at the date of the new laws, and thus of Safety Kleen's arrival, his estimate as to Gurley coming before

Safety Kleen cannot be tied precisely to the 1972 to 1975 period. Also, while Mr. Spann described the identifying features of the Gurley truck that he saw at the 2700 Poplar location before 1972, he did not provide a similar description for his sightings at the Mt. Moriah location. Finally, while Mr. Spann testified that he did not see any other trucks picking up used oil at the Mt. Moriah location, he also described the layout of the dealership as such that he would not necessarily have seen a truck picking up oil from the underground tank. Taking the facts in the light most favorable to DFI, Mr. Spann's testimony is not conclusive as to whether Gurley picked up DFI's waste oil during the relevant time period.[6]

In addition, Mr. Gurley declared that the DFI dealership on Mt. Moriah was one of Gurley's best or most consistent sources of waste oil and that Gurley did pickups from DFI on Mt. Moriah from 1972 through 1975. Mr. Green, Gurley's driver for Memphis in that period, however, referred only to a Ford dealership on Union, not to one on Mt. Moriah. The Court cannot consider Mr. Gurley's statements to be conclusive, when Gurley's own driver could not recall pickups at Mt. Moriah, but specified only Ford dealerships in another location.

These fact issues prohibit the entry of summary judgment in Plaintiffs' favor on the issue of § 113 liability.

## IV. Corporate Successor Liability

### A. Legal Standard

■ A successor corporation may be held liable for its predecessor's CERCLA liabilities. See Anspec, 922 F.2d at 1245.

Courts in the Sixth Circuit use state law to determine whether one corporation is the successor of another. See id. at 1245, 1248 (6th Cir.1991) (declining to fashion federal common law rule for corporate successor liability under CERCLA and holding that state corporate law applies).

■ The general rule is that a corporation that purchases the assets of another corporation is not automatically liable for the obligations of the seller. This rule is subject to four exceptions in which liability will attach: (1) where the purchasing corporation expressly or implicitly agrees to assume the selling corporation's liabilities; (2) where the transaction amounts to a consolidation or merger of the two corporations (a de facto merger); (3) where the purchasing corporation is a mere continuation of the selling corporation; and (4) where the transaction is entered into fraudulently, in order to escape liability for the obligations of the selling corporation. City Mgmt. Corp. v. U.S. Chem. Co., 43 F.3d 244, 251 (6th Cir.1994) (applying Michigan law and calling this rule "universally-accepted"); IBC Mfg. Co. v. Velsicol Chem. Corp., No. 97–5340, 1999 WL 486615, at *2 (6th Cir. Jul.1, 1999) (same rule is Tennessee law).

■ A de facto merger is distinct from a legal merger, in which the selling corporation's legal entity disappears. In a de facto merger, "there is a sale of substantially all of one corporation's assets in exchange for the stocks and bonds of the purchasing corporation." Jennings Neff & Co. v. Crystal Ice Co., 128 Tenn. 231, 159 S.W. 1088, 1089 (1913). The selling company retains no assets and goes out of business, but its legal entity remains. Id.

---

6. Having determined that Mr. Spann's testimony is not sufficient to direct summary judgment on § 113 liability for Plaintiffs, the Court need not address Plaintiffs' argument that Mr. Spann's testimony constitutes an "admission" by DFI under Federal Rule of Evidence 801(d)(2). Although Mr. Spann may well have been a representative of DFI, it is unclear whether his deposition testimony, taken approximately ten years after his retirement from DFI, constitutes statements made in a representative capacity for DFI.

■ The mere continuation exception requires a five part test.

> An acquiring corporation will be deemed a mere continuation of the old corporation if: (1) a corporation transfers its assets; (2) the acquiring corporation pays less than adequate consideration for the assets; (3) the acquiring corporation continues the selling corporation's business; (4) both corporations share at least one common officer who was instrumental in the transfer; and (5) the selling corporation is left incapable of paying its creditors.

*IBC Mfg.*, 1999 WL 486615, at *3 (citing *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252, 268 (1st Cir.1997)).

## B. Analysis

■ Plaintiffs argue that DFI is the corporate successor to OMC, operating on Union Avenue from 1960 through 1972, and thus is liable for OMC's CERCLA liabilities incurred in that time, assuming *arguendo* that any such liabilities exist. The alleged asset transfer to which Plaintiffs point involves the June 1, 1972, Ford franchise agreement and May 23, 1974, Ford franchise amendment. DFI, to the contrary, argues that OKF is the corporate successor to OMC and therefore is liable for OMC's CERCLA responsibilities. To defeat summary judgment on this issue, Plaintiffs would have to show a genuine issue of material fact as to one of the four exceptions to the rule of non-liability set forth above. Plaintiffs simply have not set forth any evidence that supports their argument of successor liability.

First, the elements of a de facto merger are not present. There is no showing that substantially all of OMC's assets were transferred to DFI. The only alleged asset transfer from OMC to DFI to which Plaintiffs point is the franchise agreement in OMC's name and the amendment in Hull–Dobbs Ford's name at the Mt. Moriah location. Even taking the facts in the light most favorable to Plaintiffs, amending a franchise agreement is not a transfer of "substantially all" of OMC's assets. Also, the evidence in the record, as testified to by Mr. Keesee, shows that the inventory of OMC on Union was transferred to 2700 Poplar in 1972, not to DFI at Mt. Moriah. Furthermore, there is no evidence indicating that the stocks and bonds of DFI were transferred to OMC. Second, Plaintiffs have not submitted evidence showing a fact issue on the five-point test for mere continuation liability. At the least, there is no evidence indicating that any asset transfer occurred for less than adequate consideration or that OMC was left incapable of paying its creditors. Third, Plaintiffs have not shown an express or implicit agreement by DFI to assume OMC's CERCLA liability. Fourth, there is no allegation that any asset transfer was entered into fraudulently.

Plaintiffs therefore failed to show a genuine issue of material fact on an exception to the general rule of non-liability for corporate successors.[7]

---

7. DFI cites to an unpublished Western District of Tennessee employment law case, in which Judge Brown held that OKF was the corporate successor to OMC's employment law liabilities. *See Equal Employment Opportunity Comm'n v. Oakley–Keesee Ford, Inc.*, No. C–75–367, 1976 WL 651, at *2 (W.D.Tenn.1976). The Court there used the successorship test of a showing of substantial continuity of identity in the business enterprise before and after the change in control.

*Id.* The Court described the disposition of corporate assets upon OMC's cessation of operations as an automobile dealership. First, title to the land and buildings was conveyed to the Memphis Housing Authority. Second, the "inventory of automobile parts was sold to Dobbs Ford, Inc., a newly formed (1972) corporation that operated at 2515 Mount Moriah Road in Memphis." Third,

> [h]owever, most other identifiable assets of the Oakley Motor Co. enterprise were trans-

In addition, Plaintiffs' reliance on the Ford franchise agreement and amendment seems over-stated. First, neither document was fully executed, which indicates that they were not binding contracts. Second, the address provided for OMC on the franchise agreement—1064 Union—is different from the 1048 Union address previously given for OMC. Third, the amendment does not name DFI, but Hull–Dobbs Ford, although at the Mt. Moriah location. Fourth, it is not even clear that the original agreement was the one amended by the May 23, 1974, amendment. The amendment states only that "The parties hereto have previously entered into a Ford Sales and Service Agreement dated June 1, 1972." The parties produced no other franchise agreement from June 1, 1972. The fact that the parties listed in the agreement ("Oakley Motor Company") and the amendment ("Hull–Dobbs Ford, Inc.") differ, however, is at least an indication that a separate original agreement between Hull–Dobbs Ford and Ford might exist. There is certainly a fact issue as to whether the May 23, 1974, document amends the agreement between OMC and Ford. Given that these documents alone would not be sufficient to merit an exception to the general rule of non-liability, however, this fact issue alone does not defeat summary judgment on the issue of successor liability. In other words, even taking the facts in the light most favorable to Plaintiffs, the franchise agreement and amendment would not be enough to establish any one of the exceptions listed above.

Plaintiffs further argue that, assuming Hull–Dobbs Ford's amendment did amend OMC's franchise agreement, then Hull–Dobbs Ford held itself out as the corporate successor to OMC. Holding an entity out as a corporate successor, however, is not an exception to the rule of non-liability. Therefore, even if DFI (through Hull–Dobbs Ford) was shown to have held itself out as a successor to OMC, that fact would not establish one of the above exceptions.

The Court therefore holds that Plaintiffs have not proffered evidence sufficient to show a genuine issue of material fact on the question of DFI's corporate successor liability for OMC's CERCLA liabilities. Accordingly, the Court grants in part DFI's motion for summary judgment on this issue.

## V. Conclusion

Genuine issues of fact exist with regard to DFI's § 113 contribution liability to Plaintiffs from activities occurring at the Mt. Moriah location from 1972 through 1975. Accordingly, the Court **DENIES** both DFI's and Plaintiffs' motions for summary judgment on that issue. Plaintiffs did not proffer evidence establishing an issue of fact as to DFI's corporate successorship status for OMC's alleged CERCLA liabilities incurred at the Union location from 1960 through 1972. Accordingly,

---

ferred to Oakley–Keesee. That is, Oakley–Keesee purchased the entire automobile inventory of Oakley Motor Co. Seventy-five (75%) percent of the employees of Oakley Motor Co. were hired by Oakley–Keesee. Four of the five supervisory positions employed under the General Manager of the corporation were filled with previously Oakley Motor Co. supervisory personnel. Custody and control of the Oakley Motor Co. employee personnel records were transferred to Oakley–Keesee.

Fourth, the Court noted that OKF acquiesced in corporate successorship status by not objecting to the relevant EEOC charge and by participating in the investigatory and conciliatory process. *Id.* The Court therefore held that OMC and OKF became "identical." *Id.*

This unpublished decision, between different parties and in the employment law context, is not binding on this Court as to corporate successorship status. The Court, however, includes it as further evidence that the majority of OMC's assets were not transferred to DFI.

the Court **GRANTS** in part DFT's motion for summary judgment on the issue of its responsibility for OMC's CERCLA liabilities.