NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0757n.06

No. 11-5522

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| RAY FLAKE, et al, | ) | |
| | ) | **FILED** |
| Plaintiffs-Appellants, | ) | Aug 15, 2013 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | |
| SCHRADER-BRIDGEPORT INTERNATIONAL, | ) | ON APPEAL FROM THE UNITED |
| INC., fka SCHRADER AUTOMOTIVE INC., | ) | STATES DISTRICT COURT FOR |
| TOMKINS PLC, and ARVINMERITOR, INC., | ) | THE MIDDLE DISTRICT OF |
| | ) | TENNESSEE |
| Defendants-Appellees | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LEWIS EDWARD KILMARX, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Before: COOK and STRANCH, Circuit Judges; and LAWSON, District Judge.[*]

COOK, Circuit Judge. Throughout the 1960s and '70s, Schrader Automotive dumped thousands of gallons of trichloroethylene ("TCE"), a hazardous toxic waste, at various sites in Dickson, Tennessee. Schrader used TCE to degrease machinery at a plant that it operated in Dickson

_____

[*]The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

- 1 -

County (the "Dickson Plant"). The TCE contaminated Dickson's groundwater, injuring the health

and property values of plaintiffs-appellants.

Bringing several state law causes of action, plaintiffs sued defendants-appellee entities, which

comprised of (1) Schrader's present corporate incarnation, Schrader-Bridgeport International, Inc.

("SBI"); (2) its current owner, Tomkins Limited; and (3) its former owner, Meritor, Inc.[2] The district

court dismissed Tomkins for lack of personal jurisdiction and granted summary judgment in favor

of SBI and Meritor. Plaintiffs appeal both decisions, and we AFFIRM.

I.

This case's lengthy history spans Tennessee state court, federal bankruptcy court, and federal

district court. After defendants removed the case, the district court consolidated the suits of three

groups of plaintiffs—the Flakes, the Armstrongs, and a group of parents from Dickson, Tennessee

(the "Adkins plaintiffs"). The Flakes are a married couple who purchased land in Dickson that

contained a natural spring. After buying the property in 2002, they discovered that TCE

contaminated the spring, upending their plans to bottle and sell the spring's water. Another married

couple, the Armstrongs, own land in Dickson; they too claim TCE-contaminated water diminished

---

[2]Each of the defendants has a complex corporate history and has operated under different names at different times. For simplicity, we refer to each only by its present name—Tomkins, SBI (also known as SAI, Schrader, and Schrader-Bridgeport), Meritor (also known as Arvin and ArvinMeritor), and Scovill (also known as Saltire).

their property's value. Finally, the Adkins plaintiffs are the parents of 13 children who live or have lived in Dickson County. According to their complaint, each child suffers from a "serious, congenital deformit[y]." They attribute these birth defects to the fact that the mothers of the children used TCE-contaminated water from wells around Dickson County for domestic purposes during their pregnancies.

Plaintiffs now seek to hold SBI and its series of owners, Meritor and Tomkins, liable for the Dickson Plant's pollution as successors-in-interest. Because these claims require an examination of Schrader Automotive's incorporation and changes in ownership, we begin by tracing the corporate history by which Schrader Automotive, an unincorporated division of Connecticut-based Scovill, became SBI, a subsidiary of international holding company Tomkins.

*A. Schrader's History and Scovill's Responsibility for the Dickson Plant*

From beginnings as a button manufacturer—it supplied buttons to soldiers fighting in the War of 1812—Scovill grew into a major brass company. Seeking to acquire companies that consumed brass, Scovill purchased Schrader Automotive, a valve manufacturer, in the 1920s. Scovill operated Schrader Automotive as one of its six unincorporated divisions. From the Dickson Plant's startup in 1964 to its shutdown in March 1985, Scovill operated the plant through Schrader Automotive.

Seven months after Scovill closed the Dickson Plant, and around the time that allegations of TCE contamination began to surface, Scovill decided to divest itself of Schrader Automotive by spinning the division off into a separate corporation—SBI. In October 1985, Scovill achieved this by executing an agreement that transferred all of the assets and liabilities of Schrader Automotive to the newly incorporated SBI (the "Transfer Agreement"). [Transfer Agreement, 925 ECF No. 92-5.]

Under the Transfer Agreement, SBI gained all of the assets of the former Schrader Automotive. [*See* Transfer Agreement § 1.] In return, SBI (1) indemnified Scovill against any liabilities arising from the former Shrader Automotive's business and (2) assumed all of the liabilities of Schrader Automotive, including those stemming from the Dickson Plant. [*See* Transfer Agreement § 3, sch. 6.]

A few months later, Scovill sold the newly incorporated SBI to Meritor. In March 1986, Meritor executed an agreement with Scovill to purchase SBI (the "Purchase Agreement"). In an attempt to insulate Meritor from liability relating to the Dickson Plant, the Purchase Agreement provided that, as of the transaction's closing, SBI would not own the Dickson Plant and that Meritor would not be assuming any liability for the plant's operation:

> Exclusion of Dickson Plant. As of the Closing Date, the Company [SBI] and the Company Subsidiaries will not own, and the Balance will not include the Dickson, Tennessee plant formerly operated by the Schrader Automotive Division, and, in any event, Buyer [Meritor] is not assuming any liability or obligation arising out of or relating to the business and operations of the Dickson, Tennessee plant of the

Schrader Automotive Division, and all liabilities (whether direct or indirect, joint or several, absolute or contingent, matured or unmatured, secured or unsecured) associated with the Dickson, Tennessee plant.

[Purchase Agreement § 2.20, 925 ECF No. 92-7.] A schedule to the Purchase Agreement listing SBI's real properties omits the Dickson Plant. [Purchase Agreement, sch. 2.4C, 925 ECF No. 87-21.]

Scovill also agreed to unwind SBI's obligations to indemnify Scovill for the Dickson Plant's pollution. To this end, the Purchase Agreement required Scovill to do two things: First, it required Scovill to release SBI from any indemnity obligation arising out of the 1985 Transfer Agreement. [Purchase Agreement § 5.8.] To satisfy this requirement, Scovill and SBI amended the 1985 Transfer Agreement to rescind any indemnity obligation running from SBI to Scovill. Second, the Purchase Agreement required Scovill to indemnify Meritor and SBI for liability arising from pre-closing events (including the Dickson Plant's pollution). [Purchase Agreement § 4.2.] At the closing date of the 1986 Purchase Agreement, Scovill certified that it fulfilled its pre-closing obligations and attested to the truth of its representations in the Purchase Agreement—including Section 2.20's guarantee that Scovill retained the Dickson Plant and its liabilities. [Closing Certificate, 925 ECF No. 87-7.]

Following this sale, SBI underwent two more acquisitions and a merger—ultimately ending in the hands of defendant Tomkins. In 1995, Meritor sold SBI to KSCH Holdings, Inc. The next year, SBI merged with Bridge Products, Inc. and assumed its current name—Schrader-Bridgeport

International, Inc. Two years after that, KSCH Holdings sold SBI's parent company to Tomkins, a British holding company.

All the while, Scovill remained responsible for the Dickson Plant. After the 1986 Purchase Agreement, Scovill continued to pay the water bill and maintain insurance on the Dickson Plant, and it listed the plant as a covered facility in its Pollution Liability policies from 1984 to 1993. [Statement of Undisputed Material Facts ¶¶ 19–21, 925 ECF No. 86.] In 1988, Scovill exercised its option as lessee to purchase the Dickson Plant from Dickson County, and sold the plant to Tennsco a few months later.

Even after the sale of the Dickson Plant to Tennsco, Scovill remained responsible for the plant's waste and continued to respond to its environmental fallout. [Real Property Purchase Agmt. § 25, 925 ECF No. 87-4.] Both the Environmental Protection Agency ("EPA") and the Tennessee Department of Environment and Conservation corresponded exclusively with Scovill—not SBI, Meritor, or Tomkins—about the plant's toxic effluence. [Hudnut Aff. ¶ 3.g, 925 ECF No. 87-18; Statement of Undisputed Material Facts ¶¶ 17–18.] In 1990, the EPA ordered Scovill to investigate the extent of the Dickson Plant's pollution and to develop and execute a plan to remedy the affected land. [EPA Consent Order, 925 ECF No. 87-26.] From the time the EPA issued that order until 2004, Scovill spent over $11 million cleaning the TCE pollution. [Scovill Disclosure Stmt. 16, 00925 ECF No. 98-2.]

*B. Plaintiffs' Settlement and Proceedings in the District Court*

In early 2004, both the Flakes and the Armstrongs filed complaints against Scovill, SBI, Meritor, and several others, in the Circuit Court of Dickson County. The plaintiffs brought a variety of state-law claims, including trespass, negligence, and state statutory claims for ultra-hazardous activity. A few months after plaintiffs filed suit, Scovill filed for bankruptcy. [Saltire's Bankruptcy Petition, 925 ECF No. 16-6.] In December 2004, the Adkins plaintiffs filed their own complaint in Dickson County, asserting the same claims as the Flakes and Armstrongs.

The day after the Adkins plaintiffs filed their complaint, all three groups of plaintiffs filed proofs of claim in Scovill's chapter 11 case seeking damages for the TCE contamination. *In re Saltire Indus., Inc.*, No.04-15389 (Bankr. S.D.N.Y. Mar. 29, 2007) (stipulation and order approving settlement). SBI then removed the plaintiffs' state actions to federal court, on the ground that plaintiffs' claims "related" to Scovill's pending bankruptcy proceedings. *See* 28 U.S.C. § 1334(b) (conferring federal jurisdiction to cases "related to a case under title 11").

In March 2007, plaintiffs settled their claims with Scovill for an aggregate of $1.5 million and the bankruptcy court entered a Stipulation and Order Approving the Settlement. *In re Saltire Indus., Inc.*, No.04-15389, at ¶ 1 (Bankr. S.D.N.Y. Mar. 29, 2007) (stipulation and order approving settlement). In return, the plaintiffs released Scovill from "any and all claims" related to the TCE litigation. *Id.*¶ 4. The Settlement Agreement attempted to reserve, however, plaintiffs' claims against SBI, Tomkins, and Meritor. *Id.*

In August 2009, Tomkins moved to dismiss the case against it for lack of personal jurisdiction. Tomkins argued that, as a holding company, it merely bought and sold businesses from its London, England, headquarters and thus lacked sufficient contacts with the United States to justify the district court's exercise of personal jurisdiction over it. After allowing limited discovery on the jurisdictional issue, the court agreed with Tomkins and dismissed the case against it for want of personal jurisdiction. *See Flake v. Schrader-Bridgeport Int'l, Inc.* (*Flake I*), No. 3:07-0925, 2010 WL 1027128, *7 (M.D. Tenn. Mar. 18, 2010).

In 2011, the remaining defendants—Meritor and SBI—filed motions for summary judgment, and plaintiffs responded with their own motion for partial summary judgment. The district court granted summary judgment in favor of the defendants, finding that plaintiffs' settlement agreement with Scovill barred any further relief from SBI or Meritor. Alternatively, the court held that neither Meritor nor SBI retained liability for the Dickson Plant as successors-in-interest to the Schrader Automotive Group. *See Flake v. Schrader-Bridgeport Int'l, Inc.* (*Flake II*), No. 3:07-0925, 2011 WL 1106694, *1 (M.D. Tenn. Mar. 23, 2011).

II.

Plaintiffs challenge the district court's 2011 grant of summary judgment in favor of Meritor and SBI and its 2010 dismissal of the claims against Tomkins. We address each decision in turn.

No. 11-5522
*Flake et al. v. Schrader-Bridgeport et al.*

*A. SBI and Meritor*

We first address the district court's grant of summary judgment, which this court reviews de novo, construing the evidence and drawing all reasonable inferences in favor of the nonmoving party. *See Hirsch v. CSX Transp., Inc.*, 656 F.3d 359, 362 (6th Cir. 2011). To survive summary judgment, a party must produce more than a "mere existence of a scintilla of evidence in support" of its position. *See Shropshire v. Laidlaw Transit, Inc.*, 550 F.3d 570, 576 (6th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). If the record lacks sufficient evidence to "lead a rational trier of fact to find for the non-moving party, [then] there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation and quotation marks omitted).

The district court concluded that plaintiffs' settlement with Scovill—which released Scovill from liability for claims relating to this litigation—also released SBI and Meritor from liability arising from Scovill's actions. Applying Tennessee law to plaintiffs' tort claims, *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 68 (1938), *Hattaway v. McKinley*, 830 S.W.2d 53, 59-60 (Tenn. 1992), the district court noted that Tennessee follows the Third Restatement of Torts, which provides that "[w]hen a party is liable solely on the basis of another person's tortious conduct, . . . the party who committed the tortious acts or omissions and the party to whom liability is imputed are treated as a single unit for the assignment of responsibility." *Flake II*, No. 3:07-0925, 2011 WL 1106694, *7 (quoting Restatement (Third) of Torts: Apportionment of Liability § 7 cmt. j (2000)). Where the

Restatement thus assigns responsibility to several parties by a single measure, "a settlement with one [party] extinguishes the liability of the others." *Id.* (quoting Restatement (Third) of Torts: Apportionment of Liability § 16)); *see also Abshure v. Methodist Healthcare-Memphis Hosps.*, 325 S.W.3d 98, 107 (Tenn. 2010) ("Tennessee courts have recognized that plaintiffs should not be permitted to pursue a vicarious liability claim against a principal when they have settled with the agent and have agreed not to pursue a claim against the agent."); *Lavoie v. Franklin County Pub. Co., Inc.*, No. M2010-02335-COA-R9-CV, 2011 WL 1884562, at *8 (Tenn. Ct. App. May 17, 2011) ("It is quite nearly blackletter law that a plaintiff is not permitted to pursue a claim against a principal based solely on vicarious liability when the plaintiff has settled with the agent and thereby released the agent from liability.").

From the facts that (1) Meritor's and SBI's alleged liability stemmed solely from their status as "successors in interest" to Scovill and that (2) plaintiffs released Scovill from any claim relating to their lawsuit under their settlement agreement, the district court concluded that (3) plaintiffs' settlement of their claims with Scovill extinguished Meritor's and SBI's liability for those claims. After "extensive negotiations," plaintiffs settled their claims against Scovill for $1.5 million. *In re Saltire Indus., Inc.*, No. 04-15389, at ¶ 1 (Bankr. S.D.N.Y. Mar. 29, 2007) (stipulation and order approving settlement). In return for the payment, plaintiffs released Scovill from any liability relating to their lawsuit regarding the Dickson Plant's pollution:

> The Dickson Plaintiffs hereby release all claims, if any, that they had or may have. . . against the Debtor . . . with, or relating to, the above referenced litigation whether

> known or unknown and whether asserted or unasserted. Nothing in this Stipulation and Order shall be construed to waive, reduce, release or otherwise compromise any claims or causes or action, whether direct or derivative of the conduct of any person or entity, held by the Dickson Plaintiffs against Schrader Bridgeport International, Inc., Tomkins PLC, . . . [and] ArvinMeritor, Inc. . . .

*Id* at ¶ 4. Plaintiffs now seek to hold SBI and Meritor liable for Scovill's conduct — dumping TCE into the water supply of Dickson County. Defendants argue that Tennessee's liability-extinguishing rule releases SBI and Meritor from these claims, because plaintiffs' settlement with Scovill extinguished liability stemming from Scovill's tortious behavior. We agree that the settlement with Scovill bars the plaintiffs from pursuing claims against SBI, but for reasons different than those of the district court.

The district court based its decision on the idea that SBI's successor liability for the Dickson Plant pollution could be characterized as a form of vicarious liability, and then applied sections of the Third Restatement of Torts dealing with the liability of a principal for the acts of its agent. However, that model does not properly characterize the relationship between Scovill and SBI; neither is the agent of the other. And as the dissent points out, successor liability does not equate with vicarious liability in all cases. *See Certain Underwriters at Lloyd's of London v. Pac. Sw. Airlines*, 786 F. Supp. 867, 871 (C.D. Cal. 1992) (holding that "successor liability is not the functional equivalent of vicarious liability" when a corporation acquires another entity with notice of the latter's debts and liabilities).

Here, the plaintiffs base their claims against SBI on two theories: SBI was a mere continuation of Scovill, at least as far as the Dickson Plant was concerned; and SBI expressly assumed Scovill's liability for the Dickson Plant pollution. Because Tennessee courts have not had occasion to address these theories, we must predict how the Tennessee Supreme Court would resolve the issue. *See Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co.*, 598 F.3d 257, 264 (6th Cir. 2010).

The first theory cannot sustain the plaintiffs claims, because Scovill continued to operate as a viable entity after the sale of the Dickson Plant. It is generally held that a successor company will not be held liable for the torts of its predecessor when that predecessor corporation remains active and constitutes a viable source of recovery. *Robbins v. Physicians for Women's Health, LLC*, 38 A.3d 142, 146 (Conn. Ct. App. 2012) ("[W]e agree with the defendants' assertion that a case premised on the mere continuation or continuity of enterprise theories of successor liability may not be maintained when the predecessor corporation constitutes a viable source of recovery . . . ."); *Foster v. Cone-Blanchard Mach. Co.*, 597 N.W.2d 506, 510-11 (Mich. 1999) (holding that the availability of a corporate predecessor for recourse, demonstrated in that case by a $500,000 settlement with the plaintiffs, rendered the continuity-of-enterprise theory of successor liability inapplicable in a products liability action against the successor corporation); *see also* 19 C.J.S. Corporations § 747 (2013) ("There can be no continuity of enterprise, and thus no successor liability, if the predecessor corporation remains a viable source for recourse." (citing *Ammend v. BioPort, Inc.*, 322 F. Supp. 2d 848 (W.D. Mich. 2004))). In this case, the plaintiffs received a substantial

settlement from Scovill, which they negotiated in the bankruptcy court. There is no basis here to find SBI liable to the plaintiffs under a continuity-of-enterprise theory where Scovill remained liable for—and paid—the plaintiffs' damages.

Nor can the plaintiffs recover under their express-assumption-of-liability theory. The limits of SBI's liability is governed by its undertaking outlined in the Transfer Agreement. The pertinent section of that document reads:

> [SBI] hereby assumes and agrees to perform, pay and discharge when due, and indemnify and hold [Scovill] harmless from and against, any and all liabilities, obligations, commitments and undertakings, fixed or contingent, disclosed or undisclosed, and known or unknown, of Scovill relating to the Division's business . . . .

> Without limiting the generality of the foregoing, [SBI] specifically agrees to assume the conduct of and to defend, prosecute and resolve (by settlement, collection, satisfaction of judgment or otherwise), and to indemnify and hold [Scovill] harmless from and against, all litigation or claims seeking damages, injunctive or other relief, now pending or hereafter arising or asserted relating to the Division's business. [SBI] further agrees to cooperate with [Scovill] in connection with any such matters and to reimburse [Scovill] for any payments they may hereafter be required to make to any insurance company or otherwise in connection with any such assumed liabilities, including with respect to products liability matters.

[Transfer Agreement, ¶ 3(a).]

Unlike the dissent, we do not view that language as establishing a guarantee or suretyship. "In Tennessee, a surety is one who undertakes to pay money or to do any other act in the event that its principal fails therein." *Lebs P'ship, Ltd. v. Nw. Mut. Life Ins. Co.*, No. 965, 1992 WL 25001,

at *5 (Tenn. Ct. App. Feb. 14, 1992) (citing *U.S. Fid. & Guar. Co. v. Cassel Bros.*, 22 B.R. 408 (Bankr. E. D. Tenn. 1982)). Some of the literature recognizes a distinction between guarantees and surety agreements. *E.g.*, 23 Williston on Contracts § 61:2 (4th ed. 2013) ("The word 'surety' has generally been given a narrower meaning than the word 'guarantor,' limiting the former to one who makes a direct and unconditional promise to the creditor, as distinguished from the latter, who makes a contract, distinct from the principal obligation, to be collaterally liable to the creditor if the principal fails to perform."). But either way, that sort of promise creates express rights in third parties.

The Transfer Agreement is not so broad. Its language transfers Scovill's liability to SBI and obliges SBI to reimburse Scovill for liabilities related to the former automotive division's business. It is in essence an indemnity agreement. *See Long v. McAllister-Long*, 221 S.W.3d 1, 10 (Tenn. Ct. App. 2006) (stating that "[t]he concept of indemnity involves the shifting of the entire burden of liability from one person to another. The right of indemnity refers to a party's right to be protected from or to be compensated for a loss resulting from a legal action taken against the party by another").[3] As a general rule, "[a] plaintiff's settlement with either party to a relationship supporting

---

[3]Typically, indemnity agreements do not create a direct right of action for anyone but the indemnitee. *See* 42 C.J.S. Indemnity § 13 ("As a general rule, a contract of indemnity inures to the benefit of the indemnitee alone, or some one in his or her right, and an indemnity agreement will be held to benefit a particular party only when it is express in such effect and reflects the clear intent of the parties. It generally cannot be availed of by a third person who has a right of action or claim against the indemnitee so as to entitle such person to proceed directly against the indemnitor.") (footnotes omitted). This principle aligns with the general rule that " contracts are presumed to be executed for the benefit of the parties thereto and not third persons. . . . If . . . the benefit flowing

indemnity releases the other party to that relationship from liability to the plaintiff." Restatement (Third) of Torts: Apportionment of Liability § 22 cmt. c. When the plaintiffs settled their claims and released Scovill from damages resulting from the Dickson Plant pollution, no obligation remained for SBI to indemnify.

The plaintiffs argue that when they settled with Scovill, they reserved their rights against SBI. But there was only a single liability for the Dickson Plant harms, and Scovill paid it. The Transfer Agreement did not create a new liability. *Cf. Bippus v. Norton Co.*, 437 F. Supp. 104, 105 n.1 (E.D. Pa. 1977) ("Plaintiffs contend that both parties should be liable. This, however, is not possible. If the sales agreement did not transfer products liability risk to the purchaser, then Dresser could not be liable. If the agreement did transfer such liability, then Reed is protected and cannot be liable. Liability against both parties is therefore not possible."). We find that the plaintiffs' settlement with Scovill for pollution damages extinguished its related claim against SBI.

Plaintiffs' bankruptcy arguments also fail. First, plaintiffs argue that their release of Scovill should not operate as a release to SBI and Meritor because it occurred as part of a bankruptcy discharge. Section 524 of the Bankruptcy Code limits the effect of a bankruptcy discharge to the debtor alone—here, Scovill. *See* 11 U.S.C. § 524(e) ("[D]ischarge of a debt of the debtor does not

---

to the third party is not intended, but is merely incidental, the third party acquires no right to enforce the contract." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Concord EFS, Inc.*, 59 S.W.3d 63, 68 (Tenn. 2001) (quotation marks omitted); *see also Triangle Am. Homes v. Harrison*, E2009-01954-COA-R3CV, 2011 WL 4863713, at *11 (Tenn. Ct. App. Oct. 13, 2011).

affect the liability of any other entity on, or the property of any other entity for, such debt."). From this rule, plaintiffs reason that § 524(e) prevents the settlement order with *Scovill* from releasing *SBI and Meritor* from liability.

The flaw in plaintiffs' argument is this: the bankruptcy order did not "discharge" Scovill's debt to plaintiffs; instead, the parties settled the debt through an agreed order. This fact renders § 524 inapposite: the provision limits the effects of a bankruptcy discharge, but does not bar parties from settling their claims, even if that settlement affects the rights of third parties. *See Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc.*, 202 F.3d 223, 228 (4th Cir. 2000) (rejecting a similar argument); *In re Dow Corning Corp.*, 280 F.3d 648, 657 (6th Cir. 2002) (holding that § 524(e) merely explains the effect of a debtor's discharge, but does not prohibit the release of a nondebtor); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (D.N.J. 1997) ("When a release of liability with a nondebtor is a consensual provision, however, it is no different from any other settlement or contract and does not implicate 11 U.S.C. § 524(e).").

Last, plaintiffs submit that using their settlement with Scovill to release defendants from liability amounts to an impermissible collateral attack on the bankruptcy order. If the defendants wished to challenge the settlement order's preservation of plaintiffs' claims against SBI and Meritor, plaintiffs argue, defendants should have raised their objections before the bankruptcy judge or challenged the order on direct appeal. As evidence of the confusion wrought by defendants'

collateral attack, plaintiffs claim that the district court decision "necessarily invalidated" the entire

settlement order by triggering this provision:

> This Stipulation and Order is expressly subject to and contingent upon its approval
> by the Bankruptcy Court. If this Stipulation and Order, or any portion hereof, is not
> approved by the Bankruptcy Court or if it is overturned or modified on appeal, this
> Stipulation and Order shall be of no further force and effect . . . ."

*In re Saltire Indus., Inc.*, No.04-15389, at ¶ 16 (Bankr. S.D.N.Y. Mar. 29, 2007) (stipulation and

order approving settlement).

This argument fails. First, plaintiffs forfeited this argument by not raising it to the district

court. *See Continental Cas. Co. v. Law Offices of Melbourne Mills, Jr., PLLC*, 676 F.3d 534, 540

(6th Cir. 2012) ("[T]his court will not review issues raised for the first time on appeal, because our

function is to review the case presented to the district court, rather than a better case fashioned after

a district court's unfavorable order." (internal quote and alteration omitted)). In any case, plaintiffs

are mistaken in asserting that the district court opinion invalidates the settlement order; by its plain

terms, the provision to which plaintiffs direct the court refers only to a modification of the order "on

appeal." For the above reasons, we agree with the district court's conclusion that plaintiffs'

settlement with Scovill bars their claims against the defendants based on Scovill's conduct.

Pivoting from their successor-liability claims, plaintiffs next assert that their settlement with

Scovill did not extinguish direct claims against SBI and Meritor based on those defendants'

independent negligence. *See, e.g.*, *O'Rear v. Oman Constr. Co.*, 362 S.W.2d 217, 218 (Tenn. 1962)

(reversing dismissal under this rule where plaintiff based its claim in part on defendant's independent negligence). We agree. First, the Settlement Agreement releases Scovill from liability for claims that plaintiffs "had or may have. . . against" *Scovill*; it does not release SBI or Meritor for claims premised on their own misconduct. Second, the liability-extinguishing rule applies only where "a party is liable *solely on the basis* of another person's tortious conduct." Restatement (Third) of Torts: Apportionment of Liability § 7 cmt. j (2000). Because neither the Settlement Agreement nor the Restatement rule touch on plaintiffs' *direct* claims against SBI and Meritor, we address these claims next.

Plaintiffs assert that Meritor and SBI negligently failed to remedy the TCE pollution and failed to warn Dickson citizens whom the pollution could foreseeably harm. To establish a direct cause of action against either Meritor or SBI, plaintiffs must prove that the defendants owed a duty of care to the plaintiffs, that the duty was breached, and that the breach was the cause in fact and proximate cause of plaintiffs' injury or loss. *See Ham v. Hosp. of Morristown, Inc.*, 917 F. Supp. 531, 534 (E.D. Tenn. 1995); *McClung v. DS Ltd. P'ship*, 937 S.W.2d 891, 894 (Tenn. 1996). The district court ruled against plaintiffs on these claims, finding that plaintiffs failed to provide evidence that SBI or Meritor owed a duty of care to plaintiffs.

In the portion of their brief discussing their direct claims against SBI and Meritor, plaintiffs offer no argument regarding SBI or Meritor's duty of care. Instead, plaintiffs attempt to demonstrate

defendants' participation in Scovill's cleanup efforts. But the record evidence cited by plaintiffs fails to demonstrate that SBI or Meritor participated in the cleanup at all, let alone negligently.

Attempting to tie SBI to the TCE remediation, plaintiffs cite two items from the record. First, plaintiffs note than an SBI employee testified that SBI "provided some technical assistance" to Scovill in remediating the Dickson Plant for several months after the 1986 Purchase Agreement. [McCorkle Dep. 118, 925 ECF No. 92-4.] But later in the same deposition, the employee explains that the "technical assistance" consisted of transferring company information to Scovill in the wake of SBI's 1986 purchase by Meritor. [McCorkle Dep. 125-27, 925 ECF No. 106-1.] When asked whether any of this information bore "in any way" on the pollution in Dickson, the employee responded that he did not know. [*Id.*]

Second, plaintiffs cite a 1986 agreement in which SBI agreed to "pay all costs associated with the removal of hazardous substances located on [an affected property] . . . and all costs relating to the restoration of the . . . property." [Release and License to Go On Land, at 5, 925 ECF No. 102-4.] A 1997 affidavit concerning the same property attests to the fact that "any and all waste material and hazardous substances have been properly removed from the property by Schrader Automotive Inc." [Dunlap Aff., 925 ECF No. 102-4.]

These documents offer no help. Plaintiffs' claims arise from TCE dumping at the Dickson Plant, and the undisputed record evidence indicates that the "metal sludge" dumped at this site did not contain TCE. [*See* Swift Dep. 3, ECF No. 106-2 (noting that the "metal hydroxide sludge" did

not contain any TCE).]  Further, even if this evidence demonstrated that SBI participated in the cleanup, it fails to demonstrate that SBI did so *negligently*.

Weaker still is plaintiffs' evidentiary showing with respect to Meritor's direct liability. Attempting to tie Meritor to the Dickson cleanup, plaintiffs point to the fact that J. Kevin Nameth, the head of the Schrader Automotive Group in 1985 and 1986, held the dual titles of Meritor vice president and SBI vice president.  [Appellant's Br. 48; *see* Andrews Dep. 175-76, 925 ECF No. 92-3.]  Yet without evidence tying SBI to the TCE cleanup, Nameth's dual appointments prove nothing—plaintiffs cannot demonstrate Meritor's liability by linking it to SBI.

At oral argument, plaintiffs offered another theory regarding SBI and Meritor's duty of care: that the companies assumed an ongoing responsibility for the pollution as Scovill's successors in interest.  Even if the settlement agreement extinguished any liability that SBI and Meritor possessed for Scovill's pre-closure pollution, plaintiffs correctly argue, the settlement could not release SBI or Meritor from liability arising from their own failure to remedy the pollution.  *See O'Rear*, 362 S.W.2d at 218.  Arguably, plaintiffs forfeited this nuanced argument by failing to develop it in the portion of their briefs discussing their negligence claims against SBI and Meritor.  *See Benge v. Johnson*, 474 F.3d 236, 245 (6th Cir. 2007) (citation omitted) ("[I]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

But even granting that SBI and Meritor assumed a prospective duty to remediate the pollution and warn its foreseeable victims, plaintiffs set forth no facts demonstrating a breach of that duty. First, the record lacks any evidence that SBI or Meritor acted negligently with respect to the Dickson Plant's pollution. To the contrary, the record evidence points uniformly toward the conclusion SBI and Meritor relied on the cleaup efforts of Scovill, who bore ultimate responsibility for—and alone participated in—the cleanup effort.

Apart from a few months between SBI's incorporation and its sale to Meritor, neither SBI nor Meritor owned or operated the Dickson Plant. Scovill incorporated SBI seven months after closing the plant. Meritor entered the picture a few months later when it purchased SBI from Scovill, but Scovill reacquired the Dickson Plant before the closing date of this agreement. [*Compare* Purchase Agmt. § 2.20, 925 ECF No. 92-7 (promising to divest SBI of the Dickson Plant), *with* Schauder Closing Cert. sec. (b), 925 ECF No. 87-7 (representing that Scovill fulfilled its obligations in the purchase agreement).] As a condition of this purchase, Scovill agreed to indemnify both defendants for any liability arising from the Dickson Plant. [*See* Purchase Agreement § 4.2, 925 ECF No. 92-7; First Am. to Transfer Agmt. § 1, 925 ECF No. 92-10.] Scovill, then, retained both the plant and responsibility for its toxic effluence.

After the sale of SBI, Scovill alone endeavored to clean the plant's pollution. Among other things, Scovill responded to the EPA's demands related to the Dickson Plant, maintained insurance for the plant under its pollution liability policies, and spent over $11 million cleaning the TCE

contamination from the plant.  [Hudnut Aff. ¶ 3.g, 925 ECF No. 87-18; Statement of Undisputed

Material Facts ¶¶ 17–18 (discussing Scovill's correspondence with the EPA); EPA Consent Order,

925 ECF No. 87-26 (ordering Scovill to remedy Dickson Plant's pollution); Scovill Disclosure Stmt.

16, 925 ECF No. 98-2 (describing sums expended on TCE cleanup).]  Because plaintiffs fail to

produce any evidence supporting their negligence claims, we affirm the district court's grant of

summary judgment in favor of SBI and Meritor.

Recognizing the inadequacy of their evidentiary showing, plaintiffs persist, arguing that the

district court erred by disallowing further discovery before ruling against them.  But plaintiffs never

sought further discovery under Rule 56(d), and thus failed to preserve this issue for appellate review.

*See Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000) ("We, like other reviewing

courts, place great weight on the Rule [56(d)] affidavit, believing that a party may not simply assert

in its brief that discovery was necessary and thereby overturn summary judgment when it failed to

comply with the requirement of Rule [56(d)] to set out reasons for the need for discovery in an

affidavit." (internal alteration and quotation marks omitted) (quoting *Evans v. Tech. Applications

& Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).

*B.  Tomkins's Dismissal*

Plaintiffs next challenge the district court's dismissal of Tomkins for lack of personal

jurisdiction under Fed. R. Civ. P. 12(b)(2).  After allowing plaintiffs limited discovery into

Tomkins's contacts with the United States, the district court dismissed Tomkins, finding that

plaintiffs failed to establish the "continuous and systematic" contacts with the United States necessary to sustain general jurisdiction over Tomkins. *See Flake v. Schrader-Bridgeport Int'l, Inc.*, Nos. 3:07-0925 *et al.*, 2010 WL 1027128 (M.D. Tenn. Mar. 18, 2010); *see also Int'l Shoe Co. v. Washington*, 326 U.S. 310, 320 (1945). We review that decision de novo. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887–88 (6th Cir. 2002).

Tomkins is a British holding company with its principal place of business in London, England. As a holding company, Tomkins primarily buys, sells, and holds manufacturing companies—to this end, it purchased SBI in 1998. Apart from SBI, Tomkins owns several other United States subsidiaries, but the subsidiaries manage their own day-to-day operations. *Flake v. Schrader-Bridgeport Int'l, Inc.*, Nos. 3:07-0925 *et al.*, 2010 WL 1027128, at \*2. Though most of Tomkins's executives reside in England, several Tomkins officials live in the United States. Citing Tomkins's extensive U.S. corporate holdings and the presence of its corporate officers in the United States, plaintiffs argue that the district court erred in dismissing Tomkins for lack of personal jurisdiction. In response, Tomkins argues that it acts merely as a holding company that buys, holds, and sells companies from its London headquarters.

The burden of establishing jurisdiction over Tomkins rests with plaintiffs. *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991). Because the district court relied on pleadings and affidavits—rather than conducting an evidentiary hearing—plaintiffs need only make a prima facie showing of jurisdiction to satisfy their burden. *Neogen*, 282 F.3d at 887. In reviewing the record

evidence, we construe the facts in the light most favorable to plaintiffs and accord no weight to the controverting allegations of the party seeking dismissal—here, Tomkins. *Theunissen*, 935 F.2d at 1458. But where a defendant files a motion to dismiss supported by affidavits, as Tomkins did, plaintiffs may not rest upon allegations or pleadings alone; rather, they must set forth specific facts, by affidavit or otherwise, showing that the court has jurisdiction over the defendant. *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 930 (6th Cir. 1974).

Plaintiffs invoke only general jurisdiction over Tomkins. Due process permits a court to exercise general jurisdiction only where the defendant's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011). Because this case stems from a bankruptcy proceeding, and the bankruptcy rules provide for nationwide service of process, *see* Fed. R. Bankr. P. 7004(d), the relevant forum for this jurisdictional analysis is the entire United States. *See Med. Mut. of Ohio v. deSoto*, 245 F.3d 561, 567-78 (6th Cir. 2001). Accordingly, the question is this: does Tomkins have "continuous and systematic" contacts sufficient to render it "essentially at home" in the United States? As the district court decided, we find that it does not.

Because it operates mainly from its England headquarters, Tomkins maintains few direct contacts with the United States. For example, Tomkins denies that it (1) maintains offices, a sales or marketing force, or any operations in the United States; (2) manufactures, produces, buys, or sells products in the United States; (3) holds a business license, owns or leases land or property, or

designates an agent for service of process in the United States; (4) maintains a U.S. bank account or draws checks from banks within the United States; (5) participates in corporate transactions in the United States (it conducts these transactions through its U.S. subsidiaries); or (6) files taxes in the United States. [Pappayliou Aff. ¶¶ 10, 12, 13, 14, 18, 925 ECF No. 49.]

In support of the court's authority to exercise general jurisdiction over Tomkins, plaintiffs cite the following U.S. contacts: (1) several Tomkins officials, including George Pappayliou, Tomkins's general counsel, lived and worked in the United States; (2) Tomkins owns and periodically buys and sells United States companies; and (3) Tomkins was involved in two lawsuits in New York in 1992 and 1993. We find these contacts insufficient to warrant the exercise of general jurisdiction over Tomkins.[4]

Plaintiffs first point to the U.S. presence of several Tomkins officials. Along with Pappayliou, several Tomkins officials reside in the United States: Terry O'Halloran, James Nicol, Alan Power, Mildred Woryk, and John Zimmerman. *Flake v. Schrader-Bridgeport Int'l, Inc.*, Nos. 3:07-0925 *et al.*, 2010 WL 1027128, at *2. With respect to these officers, the district court correctly noted that "there is not any proof [that] those officers conduct[ed] Tomkins plc's subsidiaries day-to-day business within the United States." *Id.* On appeal, plaintiffs note the presence of these officials

---

[4]Plaintiffs argued before the district court that Tomkins is an alter ego of its U.S. subsidiaries. Plaintiffs abandoned this argument, however, by failing to raise it in their opening appellate brief. *See Golden v. Commissioner*, 548 F.3d 487, 493 (6th Cir. 2008).

only in passing, and make no attempt to describe their activities or the nature of their work for Tomkins.

Plaintiffs direct the bulk of their argument toward the presence of Pappayliou in Ohio. Pappayliou joined Tomkins after Tomkins acquired Philips Industries in 1990, beginning his tenure as general counsel of Tomkins Industries, an American subsidiary of Tomkins, and rising to the rank of general counsel of Tomkins in 2003. [Tomkins plc SEC Form 20-F at 41; App'x I at 63.] Pappayliou lives and works in Dayton, Ohio. [Tomkins's Response to Pl.'s First Interrogatories ¶ 3, App'x I at 65.] From his Ohio office, Pappayliou regularly performs his duties as Tomkins plc's general counsel. [*Id.* ¶ 4, App'x I at 65.]

Though the presence and business activities of a corporate officer like Pappayliou can justify the exercise of general jurisdiction over a foreign corporation, plaintiffs' sparse contacts fail to do so. Compare Pappayliou's activities with those of the corporate officer in *Perkins v. Benguet Consolidated Mining Company*, 342 U.S. 437 (1952). Both Pappayliou and the corporate officer in *Perkins* served foreign corporations while living and working in Ohio. *Id.* at 447-48. Unlike Pappayliou, who served only as general counsel, the corporate officer in *Perkins* was the president, general manager, and principal stockholder of the company. *Id.* Further, the officer in *Perkins* maintained an office in Ohio where he kept company files, held director's meetings, carried on correspondence relating to the business, drew and distributed salary checks from Ohio bank

accounts, engaged an Ohio bank to act as a transfer agent, and supervised policies dealing with the rehabilitation of the corporation's properties in the Philippines. *Id.*

Plaintiffs offer no evidence that Pappayliou played a similar role in directing Tomkins's business activities. In order to demonstrate a prima facie showing of jurisdiction, plaintiffs need to provide *specific* facts establishing systematic and continuous contacts with the United States. *Weller*, 504 F.2d at 930. Plaintiffs' arguments, which rely on Pappayliou's official title and general duties as Tomkins's lawyer, fail to show that Pappayliou directed Tomkins's business operations from Ohio.

Plaintiffs next point to Tomkins's acquisition activities in the United States, including its 2003 acquisition of Stackpole Limited. These contacts too fall short. Acquisitions are temporary and sporadic, rather than "continuous and systematic," and most courts reject acquisition activity as a proper basis for the exercise of general jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 418 (1984) *(*"[M]ere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions."); *Goodyear*, 131 S. Ct. at 2856 (holding "the sales of petitioners' tires sporadically made in North Carolina through intermediaries" insufficient to support general jurisdiction); *In re Chocolate Confectionary Antitrust Litig.*, 641 F. Supp. 2d 367, 397 (M.D. Pa. 2009) ("[C]ourts have been reluctant to use acquisition activity within a forum as a basis for exercise of general jurisdiction. Corporate acquisitions occur during a distinct

period of time, and the interaction between the parties ceases at the transaction's closing. A transaction is similar to a single, sporadic forum contact rather than a continuous business presence."). Accordingly, we find that Tomkins's acquisition activity falls short of the "continuous and systematic general business contacts" necessary to subject it to general jurisdiction. *Goodyear*, 131 S. Ct. at 2857 (quoting *Helicopteros*, 466 U.S. at 416).

Finally, plaintiffs point to Tomkins's involvement in two lawsuits. The first is a 1992 lawsuit—*Brylgrove Ltd. v. Tomkins, PLC*, 587 N.Y.S.2d 135 (App. Div. 1992)—in which a New York appellate court found that Tomkins "sufficiently 'transacted business' in New York to be subject to the jurisdiction of courts of New York." *Id.* The second is a 1993 lawsuit that Tomkins itself filed in New York—*Tomkins PLC v. Bangor Punta Consol. Corp.*, 599 N.Y.S.2d 563 (App. Div. 1993). These cases betray a fact damaging to plaintiffs' argument—that over 20 years has passed since Tomkins has been party to a suit in the United States—while failing to demonstrate anything about the present nature of Tomkins's U.S. contacts. The first suit merely established *specific*—not general—jurisdiction over Tomkins. The second case, also nearly twenty years old, proves little about the current state of Tomkins's contacts with the United States.

For these reasons, we find that plaintiffs fail to carry their burden of demonstrating that Tomkins maintained such "continuous and systematic contact" with the United States that we could consider it "essentially at home" here. *Goodyear*, 131 S. Ct. at 2851. Accordingly, we affirm the district court's dismissal of Tomkins.

*C. Whether the District Court Abused its Discretion in Limiting Discovery*

Finally, plaintiffs challenge the district court's denial of an opportunity to depose seven SBI and Tomkins officials, claiming that the improper denial impaired their attempt to establish personal jurisdiction over Tomkins. This court reviews the decision to deny or limit discovery for abuse of discretion, and reverses only when left with "a definite and firm conviction that the trial court committed a clear error of judgment." *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1276 (6th Cir. 1998); *see also S.S. v. E. Ky. Univ.*, 532 F.3d 445, 451 (6th Cir. 2008).

At the time the district court ruled on Tomkins's motion to dismiss, Tomkins had been a party to plaintiffs' lawsuit for over five years and already submitted to extensive jurisdictional discovery. The district court allowed plaintiffs to develop their jurisdictional arguments by conducting three depositions and submitting a set of interrogatories and document requests. [Lutz Dep., App'x I at 89; Parkes Dep., App'x I at 208; Cervelli Dep., App'x II at 260; Tomkins's Response to Pls.' Interrog. and Doc. Requests, App'x I at 64.] After plaintiffs served another set of discovery requests and declared their intention to depose six more witnesses, the district court granted Tomkins's motion for a protective order. [Order, 927 ECF No. 81.] Though the additional depositions may have provided more information supporting plaintiffs claims, nothing in the record persuades us that the district court abused its discretion in limiting discovery. *Dean*, 134 F.3d at 1276.

No. 11-5522
*Flake et al. v. Schrader-Bridgeport et al.*

III.

We AFFIRM the district court's dismissal of Tomkins and AFFIRM the grant of summary judgment in favor SBI and Meritor.

No. 11-5522
*Flake et al. v. Schrader-Bridgeport et al.*

**STRANCH, Circuit Judge, concurring in part and dissenting in part.**

This case involves intricate corporate relationships, pollution of a community's water supply and, despite expensive remediation efforts, allegations of continuing water contamination and resulting birth defects in the community's children. It arises in the context of a series of corporate structural changes—passing back and forth the liability for the plant's pollution—and the bankruptcy of a primary corporate defendant. In the forest of issues presented, I agree with many of the majority's determinations, including its explanation of the facts and its conclusions that: (1) judgment was properly granted against the Plaintiffs on their direct claims of negligence against SBI and Meritor; (2) Meritor was properly dismissed because the only claim against it was for its independent negligence; and (3) there is no general personal jurisdiction over Tomkins. I cannot agree, however, that SBI is not liable as a successor-in-interest under the express-assumption theory of successor liability. Nor can I agree that the settlement the Plaintiffs were able to negotiate with Scovill in its bankruptcy proceedings necessarily extinguished this liability.

The Plaintiffs allege that pollution of a community's water supply caused economic losses to land and business owners and personal injury to children and their families as a result of serious congenital deformities in a number of the community's children. Given the magnitude of the current and continuing harms alleged, I do not think that a $1.5 million settlement is necessarily a "substantial" one, as the majority calls it. Nor can I subscribe to the conclusion that the Plaintiffs' arguments here constitute an effort to "have it both ways." Environmental pollution cases such as this one raise unique concerns, such that—at least in the federal-common-law context—there has

- 31 -

been a recognition that it may be reasonable to hold predecessor and successor corporations jointly and severally liable for a plaintiff's damages. *See, e.g.*, *United States v. Carolina Transformer Co.*, 978 F.2d 832, 841 (4th Cir. 1992) (affirming joint-and-several liability where the transfer of the business "was part of an effort to continue the business in all material respects yet avoid the environmental liability arising from the [the contamination of a landfill]" ). It is appropriate to proceed on that premise here for the following reasons.

Tennessee courts have recognized at least four general species of successor liability: (1) express or implied assumption of liability, (2) de facto mergers, (3) the purchasing corporation is a mere continuation of the selling corporation, and (4) fraudulent schemes to escape liability. S*ee Hopewell Baptist Church v. Se. Window Mfg. Co.*, No. E2000-02699-COA-R3-CV, 2001 WL 708850, at *4 (Tenn. Ct. App. June 25, 2001); *Gas Plus of Anderson Cnty., Inc. v. Arowood*, No. 03A01-9311-CH-00406, 1994 WL 465797, at *3 (Tenn. Ct. App. Aug. 30, 1994); *Signature Combs, Inc. v. United States*, 331 F. Supp. 2d 630, 640 (W.D. Tenn. 2004) (applying Tennessee law). Connecticut, whose law governs the interpretation of the 1985 Transfer Agreement, does the same. *See Chamlink Corp. v. Merritt Extruder Corp.*, 899 A.2d 90, 93 (Conn. Ct. App. 2006).[1]

---

[1]The parties agree that the terms of the 1985 Transfer Agreement dictate that Connecticut law controls the interpretation of the agreement. *See Woody v. Combustion Eng'g, Inc.*, 463 F. Supp. 817, 819 (E.D. Tenn. 1978) ("The general rule in Tennessee is that interpretation of a contract is to be governed by the law which the parties intended."). As the Plaintiffs acknowledge, however, it does not appear that Connecticut and Tennessee law differ on the question of express assumption of liability, and presumably Tennessee law—not Connecticut law—would govern the application of the extinguishment doctrine to any assumed tort liability. *See Hataway v. McKinley*, 830 S.W.2d 53, 59–60 (Tenn. 1992).

The Plaintiffs advanced the first and third of the above theories as to SBI—claiming that SBI expressly assumed liability for the Dickson plant and also that SBI was "merely a continuation" of Scovill. The district court addressed only the argument that SBI represented a "mere continuation" or "continuity of enterprise" of Scovill, finding no successor liability based on those theories. The court failed to acknowledge or rule on the Plaintiffs' more straightforward argument that SBI became liable as a result of its express assumption of liability. The majority here does consider this express-assumption argument, but rejects it because it finds the October 1985 Transfer Agreement was "in essence" an indemnity agreement, which did not create a direct right of action against SBI for anyone but Scovill. I respectfully disagree.

As I read the majority opinion, it seems to reduce the express-assumption theory of successor liability to a raw contract claim—to be treated as nothing more than an attempt by a third-party beneficiary to enforce a contract to which he or she was not a party. It is true that Plaintiff's express-assumption successor-liability claim is based on the language of the various contracts in this case. But it also bears noting that the Plaintiffs did not bring a simple common-law contract claim against SBI; they brought a tort claim. And while general contract principles may be relevant to considering whether liability has been expressly assumed, an express-assumption successor-liability claim does not *necessarily* fail where a contract claim may fail. *See Haywin Textile Prods., Inc. v. Int'l Fin. Inv.*

*& Commerce Bank Ltd.*, No. 00 Civ. 8633 RLC, 2001 WL 984721, at *4 (S.D.N.Y. Aug. 24. 2001),

*aff'd* 38 F. App'x 96 (2d Cir. 2002).[2]

In any case, I interpret the language of the contracts in Scovill's liability-hot-potato game

differently than the majority. Under the October 1985 Transfer Agreement, SBI burdened itself with

the Dickson-plant liabilities in two distinct ways: (1) by assuming liability for "all obligations and

liabilities of Scovill relating to" the former Schrader Automotive Division's business and (2) by

agreeing to "indemnify and hold harmless" Scovill against liabilities assumed under the agreement.

Scovill and SBI's attempt to cancel (and later reverse) SBI's obligation to *indemnify* Scovill

did not alter SBI's initial assumption of liability. First, the 1986 Purchase Agreement effected no

change in liability assumption. The October 1985 Transfer Agreement—the instrument by which

SBI assumed liability—provided that the parties could only amend the agreement "by written

instrument making specific reference to [the Transfer Agreement] signed by the party against whom

enforcement of any such amendment . . . is sought." Because the 1986 Purchase Agreement makes

---

[2]In *Haywin Textile*, the defendants argued that Bangledeshi law (which was being applied in the case) did not allow for third-party-beneficiary contract actions. *Haywin Textile Prods., Inc. v. Int'l Fin. Inv. & Commerce Bank Ltd.*, No. 00 Civ. 8633 RLC, 2001 WL 984721, at *4 (S.D.N.Y. Aug. 24. 2001), *aff'd* 38 F. App'x 96 (2d Cir. 2002). The district court held that, nonetheless, the plaintiff's action could still be brought under the express-assumption successor-liability doctrine, distinguishing the two doctrines by stating that the successor-liability argument "is not premised upon [a plaintiff's] particular status [as a third-party beneficiary], but rather upon the defendant's position of exposure to general liability for the debts of the predecessor." Thus, in that case, "[t]he assumption of liabilities contained in the Agreement [was] relevant not because it suggests that [the successor corporation] agreed to pay [the predecessor corporation's] specific debt to [the plaintiff], but rather because it illustrates the type of relationship [the successor corporation] had with [its predecessor]." *Id*.

no reference to the 1985 Transfer Agreement, it fails to satisfy this requirement and therefore had no effect on the assumption of liability.

Second, the subsequent "First Amendment to Transfer Agreement" also failed to modify SBI's assumption of liability. The amendment released SBI from

> [a]ny indemnity obligations that [SBI] may otherwise have to [Scovill] under the provisions of the Transfer Agreement arising out of any situation with respect to which [SBI] and [Meritor] . . . are entitled to indemnity from [Scovill] . . . under the terms of the Purchase Agreement.

First Am. to Transfer Agmt. § 1, R. 92-10. This provision reversed the flow of indemnification—instead of SBI indemnifying Scovill against liability, the new arrangement required Scovill to indemnify SBI. But this amendment only released SBI from its obligation to *indemnify*; all of the remaining provisions of the Transfer Agreement—including SBI's assumption of liability—"remain[ed] in full force and effect." *Id.* § 4.

The Defendants counter that Scovill and Meritor, the parties to the 1986 Purchase Agreement, intended to swap liability back to ensure that neither Meritor nor SBI would assume the Dickson plant's liabilities. But the plain language of the agreement does not say so. And while SBI offers parol evidence to support its contention regarding the parties' true intent, SBI points to no ambiguity in the 1985 Transfer Agreement or the 1986 Amendment that would permit the consideration of such evidence. In Connecticut, "[w]here the language of the [writing] is clear and unambiguous, the [writing] is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." *Murtha v. City of Hartford*, 35 A.3d 177, 182 (Conn. 2011) (internal quotation marks omitted). Similarly, in

Tennessee, "the parol evidence rule . . . does not permit contracting parties to use extraneous evidence to alter, vary, or qualify the plain meaning of an unambiguous written contract." *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 672 (Tenn. 2013) (internal quotation marks omitted).

In sum, SBI unambiguously assumed liability for the Dickson plant in the 1985 Transfer Agreement, and no change was ever made to that portion of the contract. Accordingly, it is appropriate to find SBI liable as a successor in interest under the express-assumption theory of successor liability.

This returns us to the extinguishment issue. SBI argues that any successor liability was extinguished by the bankruptcy settlement because, it insists, successor liability is a type of vicarious liability—so the common-law extinguishment rule that applies to vicarious liability in Tennessee should apply to successor liability as well. SBI is correct that Tennessee still adheres to the common-law extinguishment rule in the vicarious-liability/*respondeat-superior* context. *See Abshure v. Methodist Healthcare-Memphis Hosps.*, 325 S.W.3d 98, 107 (Tenn. 2010). Other states no longer do. *See Convit v. Wilson*, 980 A.2d 1104, 1116 (D.C. 2009) (abandoning the common-law rule and citing cases from Florida, North Carolina, and New Jersey for support). The issue of this trend aside, however, vicarious liability and successor liability are distinct enough concepts that it is wrong to assume Tennessee would blindly apply the vicarious-liability extinguishment rule to successor liability in this case.

Vicarious liability and successor liability roughly overlap in some circumstances, but are distinguishable where a successor corporation's liability stems from its *express* assumption of that

liability. SBI points out that many courts and commentators have drawn comparisons between successor liability and vicarious liability. *See, e.g.*, *R.C.M. Exec. Gallery Corp. v. Rols Capital Co.*, 901 F. Supp. 630, 636 (S.D.N.Y. 1995) ("[S]uccessor liability . . . is fundamentally a form of secondary, vicarious liability imposed upon an innocent party."); Steven Semeraro, *Toward an Optimal System of Successor Liability for Hazardous Waste Cleanup*, 6 Stan. Envtl. L.J. 226, 261 (1987) ("Successor liability is a form of vicarious liability in that the party held responsible did not perform, desire, or directly benefit from the act that caused the harm."). But not all species of successor liability are alike. Where, as here, a successor corporation expressly assumes responsibility for known or expected liabilities, its liability also stems from an action of the successor corporation—the express assumption—and not simply from the tortious action of the predecessor corporation. *See* George W. Kuney, *Misinterpreting Bankruptcy Code Section 363(f) and Undermining the Chapter 11 Process*, 76 Am. Bankr. L.J. 235, 261 (2002) ("[T]he successor liability doctrine of express or implied assumption of liability is rooted in the actions of the purchaser (agreeing or appearing to agree to assume liability).").

The express-assumption doctrine of successor liability, therefore, does not fit comfortably within the definition of imputed, derivative, or vicarious liability. *See Certain Underwriters at Lloyd's of London v. Pac. Sw. Airlines*, 786 F. Supp. 867, 871 (C.D. Cal. 1992) (holding that in cases where a corporation acquires another corporation with notice of the latter's debts and liabilities, "successor liability is not the functional equivalent of vicarious liability" because the acquiring corporation is "unable to claim innocence" of the other corporation's actions); *see also* William Hao, *The Effects of Bankruptcy Discharge and Sale on Successor Liability Claims*, 17 J. Bankr. L. & Prac.

3 Art. 4 (2008) ("Traditional successor liability claims, *outside of those based on express or implied assumption*, are derivative of the underlying claim against the predecessor because they are not based upon the fault of the purchaser and because the measure of damages is based upon the liability of the predecessor." (emphasis added)).

Instead of the functional equivalent of vicarious liability, express-assumption successor liability is "the functional equivalent of a guarantee" or surety where one party has promised to accept and pay the liability of another. Alec P. Ostrow, *Free and Clear of Successor Liability or Whose Liability is it Anyway?*, 2003 Norton Ann. Surv. of Bankr. Law 119, 124–128 (2003). And under the version of the extinguishment rule applied in Tennessee suretyship law, "[t]he surety is *not* released . . . if the creditor in the release reserves his rights against the surety . . . ." *Hickory Springs Mfg. Co. v. Evans*, 541 S.W.2d 97, 99 (Tenn. 1976) (emphasis added) (citations omitted). In the case before us now, application of the extinguishment rule as it applies to suretyship in Tennessee would change the outcome because the Plaintiffs specifically reserved their rights against SBI in the Scovill bankruptcy settlement.

The principle underlying this extinguishment analysis is that a successor entity expressly assuming the known liabilities of its predecessor should not be treated merely as an innocent principal. There may be reason to protect successor corporations that have no notice of the liabilities of a predecessor, as "the interest in a fluid market in corporate assets" may be "impeded if purchasers acquire along with the assets legal liabilities of unknown, sometimes unknowable, dimensions," *E.E.O.C. v. Vucitech*, 842 F.2d 936, 944 (7th Cir. 1988). But this economic policy concern has less force where, as here, the predecessor—fully aware of all liability issues—*created* the successor. *See*

*id.* at 946 ("[T]he proper approach to the issue of successor liability is not to erect a set of hoops to force plaintiffs to jump through but to ask whether such liability would strike a reasonable balance between the interest in fully sanctioning unlawful conduct and the interest in facilitating the market in corporate and other productive assets."). The danger of a successor corporation getting sandbagged with unknown liabilities is just not present in this type of case. The danger of failing to impose the proper sanction on unlawful conduct, however, remains high.

To conclude, I would hold that the claims of the Dickson County land owners, parents and children for harms suffered as a result of environmental pollution may proceed against SBI under the express-assumption theory of successor liability. There is no basis in Tennessee law for applying the vicarious-liability extinguishment rule in the context of an *express* assumption; nor is there a rational policy-based reason to import such a rule. Policy points the other way. Extinguishment should not apply where a corporation intentionally passes reasonably knowable liabilities to a new entity of its own creation. Environmental contamination cases provide a good example of why—they point to the danger that a transaction could be structured to separate assets from liabilities, leaving recognized wrongs without viable remedies. For these reasons, I respectfully dissent.